May it please the Court. My name is Hillary Schwab. I represent the plaintiffs in this matter. Your Honors, the District Court decided four things in its decision granting J.B. Hunt's motion to dismiss, all of which are ripe for this Court's decision. First, it decided that Prong 2 of Section 148B was preempted by the F-Quad A. Second, it decided that Prongs 1 and 3 could not be severed from Prong 2. Third, it decided that even if Prongs 1 and 3 could have been severed, they would also be preempted under the F-Quad A. And four, it decided that the wage law and unjust enrichment claims would have to be dismissed as well. All four of these issues are appropriately decided by the Court at this juncture. On severability, I know the Court has had the benefit of an argument immediately before this. On severability, I just want to point out that there is a legislative and judicial preference in favor of severing invalid provisions and statutes. So rather than leave it to the legislature, the Court can look to the fact that the legislature has already said that provisions of a statute shall be deemed severable. And there is, in fact, a legislative imperative in favor of doing so. What is your view on the relationship between the statute and Massachusetts common law? I would agree with my brother, who argued previously that the statute goes further than the common law. The common law is akin to Prong 1 of the statute, but Prong 3 of the statute takes into account more of what might be described as the economic reality of the relationship. Does the statute at all preempt or foreclose application of the common law? In other words, if we were to find that Section 2 is preempted, but the statute is left in place with 1 and 3 still operative, would that in any way impair the current breadth or reach of the common law as compared to what it would be if we found the whole statute preempted? At this point, the common law is not applied for purposes of determining independent contractor status in Massachusetts. It's the statute that is applied. So the difference would be that if the entire statute were struck, the Court would revert back to that common law test. But as a practical matter, I don't see the common law test as being substantively different than Prong 1. So while the common law wouldn't apply if Prongs 1 and 3 survived, that's the situation now. The common law doesn't apply and isn't looked at in the case of independent contractor misclassification. So 1 and 3 alone, in your view, are not less protective of workers' rights than the common law? That's correct. In fact, they're somewhat more protective. They're somewhat more protective. They're sort of like the common law test plus the FLSA economic realities test. So we would submit that Prong 2 is severable, both based on the language. It's seamless to remove Prong 2. It's an and test as opposed to a balancing test. So there's no question of the legislature intending that Prong 2 would have to be considered in any analysis. Also significant is the timing of the statutes. Prongs 1 and 3 have been in effect in their current form since 1990, whereas the version of Prong 2 that's being considered by this court wasn't enacted until 2004. But turning beyond the severability issue, the issue of the preemption of Prongs 1 and 3 themselves, J.B. Hunt continually emphasizes in its brief that the issue with Section 148B is Prong 2's ban on the independent contractor relationship. And similarly, in the second Mass Delivery Association case, this court focused on Prong 2's effective prohibition on motor carriers from engaging their couriers as independent contractors. So even assuming that this premise is true, that Prong 2 would effectively ban independent contractor classification of drivers in Massachusetts, that can't be said as to Prongs 1 and 3, and in fact the defendant doesn't even argue it. Those two prongs do not forbid the independent contractor business model, and it follows even beyond that there's an additional hurdle of proving a significant impact, but that significant impact can't be proven here. I have a few questions. Is Massachusetts the only state that has the equivalent of Prong 2? No. There are several other jurisdictions that have ABC tests, and not all of the B prongs are as restrictive as the Massachusetts, but there are some. I believe Illinois' ABC test also has a prong B similar to the Massachusetts independent contractor statute, and I believe that Connecticut also has an ABC test. I'm confident that that's in the briefing in the Schwann case and likely in our briefing as well. Secondly, and then Judge Stahl has a question, I understood this prong B started out as something that affected only the construction trades. It was going after what may have been during a period of great building addressed to a particular concern. How is it, and is there any explanation for why it expanded beyond the construction trades? What happened was that it was passed as part of a large group of legislation in the session laws that were entitled an act relative to public construction. However, when it was placed into the statutes as enacted, it was placed into the Wage Act, into Section 148B with no provision. So this may have been a mistake? No, I don't believe it was a mistake for at least two reasons, those being that the Attorney General and the Supreme Judicial Court have both made clear that despite the fact that it was enacted as part of legislation relating to the public construction industry, that it is intended to apply to all industries in Massachusetts. So the Attorney General, which is the entity charged with enforcing the statute, has made that clear as has the Supreme Judicial Court. So at this point, whether or not it was first raised in the context of public construction, there's no question that it applies universally as evidenced by the plan language and interpretation. In the interstate carriage of goods, assuming that the goods are picked up at a Massachusetts plant for delivery in Texas, they're going to go through many states along the way. If prong two is not preempted, does that not require the independent contractor, who would be perhaps an independent contractor in another state, having to address their approach to wages for his or her drivers separately as they go through the various states? Isn't that a direct effect on carriage of goods? It is not. I understand Your Honor's question. It is true that as with many state laws, the company and the drivers have to take into account the different state laws. So when you go through a state border, you have to check what the speed limit is. And the speed limit is going to affect how quickly you can get through the state and how much money they're going to have to pay the driver. That's true of many laws that differ from state to state. However, the question is whether there is a significant impact on prices, routes, or services. And here it's too far attenuated. Yes, for purposes of the Wage Act, when the driver is in Massachusetts, they would have to ensure that the driver is paid at least above the Massachusetts minimum wage and otherwise consistently with the wage laws. You would have to give him or her the medical leave, which the state passed a year ago. There are a whole bunch of Massachusetts laws which seem to me would be affected, which would make it very difficult to operate as an independent operator if one was going to operate in Massachusetts. Well, the question is if you had to operate as an employer instead of an independent operator, would that constitute a significant impact? And frankly, at this point, we don't know whether that impact would be significant. Would there be an impact? Yes, of course there would be an impact. But the question isn't just whether there would be an impact but how significant it would be. So you think that we need to adopt a rule which would require in every single case, a case-by-case analysis of whether the impact in that particular industry was significant? I think that at this point, the court, either in this case or in other cases, does not have the record before it to determine the significance of the impact. So whether or not it has to be case-by-case or not isn't a question that I think we even need to reach because the records before the court in previous cases and in this case are not sufficient. And to that end, I want to note that in this case, this decision was made on a motion to dismiss, which in and of itself may or may not be relevant, but here J.B. Hunt does have employee drivers in Massachusetts and independent contractor drivers. So all that we know on the record in this case is what's said in the complaint, and the logical inference from that cannot be that there's a significant impact because they do have employee drivers and grapple with these issues that Your Honor has raised. Does the record show whether there's in-state employee drivers are simply doing intrastate business as opposed to interstate business? It does not. So all we have is the complaint. The complaint lists job listings that are identical, virtually identical for employee drivers and independent contractor drivers, and that people are hired to do essentially the same jobs. So I think you could infer from that record that if there are independent contractors going across state lines, there are also employees going across state lines, but at this point the record is silent on that. And I see my time is up. I just want to say for 10 seconds raise the truth in leasing regulations argument that the defendant has raised in this case but was not considered by the court below and just emphasize to Your Honors that the truth in leasing regulations deal with the leasing of equipment. They do not deal with employment status. They explicitly state that they have no bearing on employment status, and as such there's no conflict. They don't occupy the field, and they do not preempt Section 148B. Thank you. Thank you, Your Honors. Good morning. May it please the Court, David Casey and with me Steve Melnick on behalf of J.B. Hunt. The United States Supreme Court most recently in Ginsburg versus Northwest Airlines and this court have said without qualification that there is no need to introduce empirical evidence to win these cases to establish F-Quad A preemption. The Ninth Circuit and the California Supreme Court, both far more hostile to F-Quad preemption than is this court, have said in two separate cases, American Trucking at the Ninth Circuit and PAC Anchor before the California Supreme Court, that a ban on the use of independent contractors in the motor carrier industry is without more per se. F-Quad A preempted. So the notion that we have to generate a significant showing, an evidentiary showing, that banning the use of independent contractors would have a significant effect on prices, routes, and services just ain't so. That's not what the Supreme Court has said, and that's not what this court has said. You and Mr. Jay seem to have somewhat different views. He pointed to four or five things that he said went to significant impact. You are making the argument that no evidence need to be considered, that this is just a matter of pure logic. Is that the case here, or do you occupy some middle ground somewhere? Well, there is a middle ground. It is a matter of pure logic, but logic is based upon the facts that Judge Stahl was talking about. The employment relationship is perhaps the most highly regulated relationship in American law. And so if you're going to be servicing consumers in the trucking or delivery industry with contractors as opposed to W-2 employees, those are not only different business models in some abstract sense, but the day-to-day reality of the restrictions on service and prices is profound. Meal breaks, statutes that provide for leave of absence, statutes that provide for accommodation of religious views, and the like, all fundamentally constrain what a carrier can do in terms of getting product from point A to point B. They interrupt the flow, and they increase the cost. And this court made it fairly clear, I think, in the MDA decision that that was the case. But it's not just this court. Again, the Ninth Circuit and the California Supreme Court have both said that a ban on the use of independent contractors is per se a violation of F-Quad-A. And those courts, once again, have used an analytical framework that is far more hostile to F-Quad-A preemption than has this court or the United States Supreme Court. They require that in order for the state regulation or statute to be preempted, it has to bind the carriers to a particular price or service. That's not what the Supreme Court said in Roe. That's not what the Supreme Court said in Morales. And that's not what this court said in Fiori or in MDA. I just have a quick question, which I know the record isn't going to say yet because of how this case got here. But does anyone know what percentage of the trucking which is interstate is done by owner-operators as opposed to employee of trucking companies? So we addressed this briefly in our principal brief with studies that we believe the court can take judicial notice of. I don't have that statistic at the ready. But historically, it's fair to say that the preferred model in the trucking industry was an owner-operator model in which owner-operators owned their own trucks, leased them back to the carrier, and it provided for maximum flexibility to both the carrier and a greater profit opportunity for the owner-operator. But what is the precise percentage for either intrastate or interstate? I don't have the answer to that, Your Honor. What is the significant effect that you say need not be shown in the record but we can just logically infer? The one that you've said so far is cost, increased costs, but clearly that can't be sufficient unless the fuel tax gets struck down as well. Service. And so what logical effect should we assume that going from owner-operator to employee would impact service? If you have an independent contractor driving a truck, you don't have to make sure that they stop every five hours for 30 minutes. You don't have to give them one day off in seven. You don't have to pay a 50% multiplier in their compensation if they work more than eight hours in a day. So these are just some of them. But then when you – and some of the most prominent ones. Well, let me stay with those for a second because those would be true. For example, you have employees at your home office who do the bookkeeping or do all the sorts of stuff that are clearly employees. Right. You could declare them all independent contractors tomorrow. And if the state tried to say, well, you can't do that. They meet all the tests. They meet the common law test. They meet one. They meet two. They meet three. You could then cite that same effect. You could say, yeah, but now I don't have to give them lunch breaks. I don't have to do this. No, I share my brother's point on this. What's the difference? They're not involved in the transportation of property, Your Honor. That's the distinction. Suppose they're the people who carry it in the warehouse or put it on the plane. That's not been interpreted as the transportation of property. Putting it on the plane is not the transportation. Well, at some point, once you get to that level of service, then perhaps it does trigger the preemptive effect. And, by the way, there are ADA cases where the line is drawn between whether someone who is injured on an airplane has a negligence case that's preempted or not. So it's only the pilots and the truck drivers that are engaged in the transportation business, and then everyone else the preemption arguments don't apply to? Broadly speaking, yes. What we do know is the people who are driving these trucks are transporting property, and they're precisely what Congress had in mind when they deregulated the field. Congress wanted to have a national uniform standard that was the most efficient standard possible to generate free flow and inexpensive movement of goods both by air and on land. And it said in F quad A, when it comes to moving product, which is the backbone of our economy, the state's got to stay out of it. And, again, the Ninth Circuit and the California Supreme Court have said unequivocally a ban on the use of independent contractors is preempted, and that's precisely what prong B does. Now, with respect to severability, the legislature, we don't know what the intent of the legislature was here because, Your Honor, it was a mistake. It was a colossal mistake. And it's interesting that in the age of Uber and in the age of Amazon, we've got a colossal legislative mistake that's regulating these infant and incredibly important industries. That's a great way to do business, which is one of the reasons you should send it back to the legislature. Let them fix this problem which they created in the first place. We don't know what their intent was because it was supposed to be dealing with just the construction industry. We do know what the effect was. And the effect was that the legislature supplanted a far more lenient common law standard. And what was the lever that it chose to do that? It was prong 2. And without prong 2, you have a fundamentally different statute, one that, in my view, is actually more synonymous with the common law than not. I think prongs 1 and 3 are really two sides of the same coin. Prong 1 is control. Prong 3 is independence. Those are two sides of the same coin. And so if prong 2 is struck, this statute is essentially synonymous with a common law. And under those circumstances, how can we possibly say that we know that the legislature would have passed this statute without the principal lever at its core? I don't think we can. It seems to me whatever choice the court makes, the legislature is going to have to rethink this issue. Absolutely. And if there are no further questions, we will rest on our brief. Thank you. Thank you. The court is going to take a brief recess. All rise, please. It won't be so brief, you don't have time to go to the bathroom in between. Thank you.